# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DOROTHY WHITAKER,

      Plaintiff,

vs.                                 Civ. No. 18-1046 KG/JFR

XAVIER BECERRA, SECRETARY,
U.S. Department of Health and Human Services,

      Defendant.

## AMENDED MEMORANDUM OPINION AND ORDER

Defendant, through the Indian Health Service, employed Plaintiff, an African American Certified Registered Nurse Anesthetist (CRNA), at the Gallup Indian Medical Center (GIMC) from January 12, 2014, through August 15, 2014. During that time, Plaintiff was on probationary status. Plaintiff alleges in this lawsuit that Defendant violated Title VII by terminating her employment on the basis of her race and color, unlawfully retaliating against her, and creating a racially hostile work environment.

Defendant filed the instant "Defendant's Motion for Summary Judgment and Memorandum in Support" (Motion for Summary Judgment) on April 16, 2020. (Doc. 36). The Motion for Summary Judgment is now fully and timely briefed. *See* (Docs. 38, 48, 49, 51, 52, and 53). The Court notes jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction). Having considered the briefing, the controlling law, and for the following reasons, the Court grants the Motion for Summary Judgment in part.

*I. Summary of Material Facts Viewed in the Light Most Favorable to Plaintiff[1]*

As noted above, Defendant employed Plaintiff from January 12, 2014, through August 15, 2014, as a CRNA at GIMC. (Doc. 36) at 3, ¶ 1. Plaintiff's employment contract provided for a 12-month probationary period. *Id.* at ¶ 2. During all relevant times, Plaintiff's first-line supervisor was Dr. Eugenio Rivera, a non-African American. *Id.* at ¶ 3. At the time of Plaintiff's termination, Plaintiff's second-line supervisor was Dr. Loretta Christensen, a non-African American. *Id.* at ¶ 4. While GIMC had other African American employees, Plaintiff was the only African American anesthesia provider at GIMC. *Id.* at ¶ 7.

Plaintiff first met anesthesiologist Dr. Herbert Gonzalez at a pre-hire visit to GIMC. *Id.* at ¶ 8. According to Plaintiff, Dr. "Gonzalez looked at her and then closed his eyes without acknowledging or responding to her." *Id.* "Plaintiff does not know if Dr. Gonzalez's reaction was related to race." *Id.* at ¶ 9. Plaintiff did not report this encounter with Dr. Gonzalez to management. *Id.* at 4, ¶ 10.

Soon after Plaintiff began working at GIMC, contract CRNA Cynthia Hamilton "repeatedly made comments to Plaintiff such as 'Why are you here?'; 'There is nothing here, anyplace is better than here'; 'They call this the badlands, because it is'; 'You should go to Atlanta, Flor[ida] . . .'; 'There ain't nothing here'; 'You can do better than this.'" *Id.* at ¶ 11 (citations omitted). Ms. Hamilton did not comment on Plaintiff's race or color. *Id.* at ¶ 12. Nonetheless, Plaintiff "reported Ms. Hamilton's comments." *Id.* at ¶ 13. Ms. Hamilton ended her employment at GIMC about a month after Plaintiff began working at GIMC. *Id.* at ¶ 14.

---

[1] Unless otherwise noted, this summary of material facts refers to undisputed material facts supported by the exhibits attached to the Motion for Summary Judgment, the amended response, and the amended reply. *See* (Docs. 36, 49 and 51).

In February 2014, Katherine Joe, a surgical technician, referred to African American physicians working at GIMC as "sistas" and "brothas." *Id.* at ¶ 15. Plaintiff did not report this comment to management. *Id.* at ¶ 16.

During a surgery in March or April 2014, Eleanor Andy, a Native American registered nurse, told Plaintiff "that African Americans made her grandchildren so upset that they would cry simply by looking at an African American individual." (Doc. 49-1) at 10, ¶ ii. Ms. Andy further told Plaintiff that "no one liked the Black girl in her granddaughter's class so the kids would 'always beat her up,' referring to the Black girl." *Id.* Plaintiff stated in an affidavit that she reported these comments to Sheila Darder-Bonilla, Ms. Andy's supervisor, and that Ms. Darder-Bonilla did not take any action.[2] *Id.* at ¶ ii.a.

On or about March 17 or 18, 2014, Defendant arranged for outside consultant Kevin Miller to lead a workshop on improving peer relationships. (Doc. 36) at 5, ¶ 21. Plaintiff attended the workshop as well as Dr. Christensen. (Doc. 49-1) at 9, ¶ v. Mr. Miller stated that "[p]eople should not be playing the race card to get out of doing their job." *Id.* He also stated that "[a] lot of people got EEO [(Equal Employment Opportunity)] complaints to prevent their supervisors from writing them up for not doing their job and people need to not play the race card, they need to just do their job." *Id.* Plaintiff complained to Mr. Miller during his presentation that his remarks offended her. *Id.* Plaintiff then followed up with an email to Mr. Miller on which she copied Dr. Rivera. *Id.* at ¶ vi.

---

[2] Plaintiff, however, testified at her deposition that she did not believe that she reported Ms. Andy's March or April 2014 comments to anyone. (Doc. 36-2) at 12, depo. at 170-71. Consistent with Plaintiff's deposition testimony, Ms. Darder-Bonilla stated in an affidavit that Plaintiff did not complain to her about Ms. Andy's comments. (Doc. 42-1) at 7, ¶ 18.

Mr. Miller responded to Plaintiff on March 20, 2014, by email. (Doc. 36-4). Mr. Miller asked Plaintiff to forgive him for making her uncomfortable and stated that he "will NEVER use the race card analogy, thanks to" Plaintiff. *Id.* Dr. Rivera did not take any further action on the incident because Plaintiff decided to communicate with Mr. Miller by email and Dr. Rivera thought Plaintiff "want[ed] to deal with it by herself...." (Doc. 42-1) at 2, ¶ 149. In fact, Plaintiff never saw Mr. Miller again. (Doc. 36) at 5, ¶ 24.

In April 2014, Mauricio Mota, a Hispanic registered nurse, used the word "Nigga" in conversing with Plaintiff about his African American military friends and how they let him use the "N word" "as a form of brotherhood." *Id.* at ¶ 25. Mr. Mota also showed Plaintiff text messages using the word "Nigga" and told Plaintiff how his father was upset when he "brought a black girl home." *Id.* (citation omitted). Mr. Mota, however, did not refer to Plaintiff as a "Nigga." *Id.* at ¶ 26. Once Plaintiff told Mr. Mota that she found the word "Nigga" offensive, Mr. Mota stopped using it in Plaintiff's presence. *Id.* at 6, ¶ 27. Even so, Plaintiff reported Mr. Mota's offensive language to Dr. Rivera, who took no action. *Id.*, ¶ 28.

In May 2014, Irma Rivera, a registered nurse, called Plaintiff a "chocolate doll." *Id.* at ¶ 29. Plaintiff did not report that comment to management. *Id.* at ¶ 30.

In June 2014, Plaintiff had breakfast with Dr. Maria Ynes Brueckner, a cardiologist. *Id.* at ¶ 31. Dr. Brueckner commented that she has a "black nose" and that when she was a child people thought she was African American because of her curly hair. *Id.* Dr. Brueckner stated that "these comments hurt her feelings, and her brother would fight people for calling her black." *Id.* (citations omitted). Plaintiff did not report these comments to management. *Id.* at ¶ 32.

On June 16, 2014, Plaintiff emailed Dr. Rivera about various complaints. (Doc. 51-1) at 5. Plaintiff first complained that Dr. Rivera's "tone seem[ed] very snappy" toward her. *Id.*

4

Plaintiff also noted that their team members "have little to nothing to say to" her, but she remains civil to them and works to communicate with them. *Id.* Plaintiff stated, "As an A-A female, if I were demonstrating the type of behavior that is being demonstrated towards me, disciplinary actions would have been swiftly taken against me, yet you dismiss me, accusing me of being 'too sensitive.'" *Id.* Plaintiff went on to suggest that Dr. Rivera email information to all Anesthesia Department members rather than to individual members in order for Dr. Rivera to more efficiently use his administrative time and not appear to single Plaintiff out. *Id.* Plaintiff concluded that they "both realize that the department is under a lot of stress, little team work [sic], extremely poor communication [sic] and [it is] significantly overworked." *Id.*

In late June or early July 2014, Dr. Rivera took Plaintiff to meet Pauline Holona, a Human Resources (HR) specialist. (Doc. 49-1) at 11, ¶ vii. Plaintiff told Ms. Holona about people making racist comments, behaving in a hostile manner, "talking about blacks in a stereotypic manner," and using the "N word."[3] *Id.* Ms. Holona responded that Plaintiff could contact an EEO person about her concerns, a standard suggestion Ms. Holona makes when an employee has a workplace concern. (Doc. 42-2) at 4.

In July 2014, while walking to the GIMC parking lot, Ms. Andy spoke to Plaintiff and referred to African Americans generally as "you people." (Doc. 36) at 5, ¶ 19. Plaintiff did not report that comment to management. *Id.* at ¶ 20.

---

[3] Ms. Holona, however, testified at Plaintiff's Equal Employment Opportunity Commission (EEOC) hearing that Plaintiff did not mention discrimination at this meeting but rather discussed interpersonal conflicts in the workplace and leave procedures. (Doc. 42-2) at 4-5.

In addition to the above specific incidents, Plaintiff's colleagues in the Anesthesia Department, Dr. Gonzalez, Dr. Juan Rossini, and CRNA Daria Jones, [4] would "not offer to relieve [Plaintiff] for work breaks." *Id.* at 6, ¶ 33. Only Dr. Rivera "would fill in for her so she could take a break." (Doc. 49-1) at 28, ¶ 38. Dr. Gonzalez, Dr. Rossini, and Ms. Jones also would not provide breaks to Dr. Rivera; they only provided breaks to each other. *Id.* at ¶ 39. Moreover, Plaintiff's "coworkers refused to speak to her and treated her 'like they were disgusted with her.'" (Doc. 36) at 6, ¶ 34 (citation omitted).

As a result of the above situation, Dr. Rivera drafted a letter of expectations which Dr. Rossini signed but Dr. Gonzalez and Ms. Jones refused to sign. (Doc. 49-1) at 28, ¶ 41. Dr. Gonzalez, Dr. Rossini, and Ms. Jones, however, did not make any comments about Plaintiff's race or color. (Doc. 36) at 6, ¶ 35. Notably, "Dr. Christensen received complaints from Plaintiff's coworkers that she was requesting excessive breaks, including while her coworkers were busy providing patient care." *Id.* at 7, ¶ 36.

On July 28, 2014, Plaintiff sent Dr. Rivera an email on which she copied Dr. Christensen. (Doc. 36-6) at 2-3. Plaintiff stated that she "continue[s] to experience a hostile work environment." *Id.* at 2. Plaintiff specifically described communication issues with Dr. Gonzalez and Dr. Rossini. *Id.* Plaintiff also indicated that she "reported several accounts of obnoxious behavior from members of the staff, persons not demonstrating any cordial or courteous behavior and that continues from both Dr. Gonzalez and Dr. Rossini." *Id.* Moreover, Plaintiff stated that Dr. Gonzales ignores her requests for breaks or lunch. *Id.* at 3. Plaintiff concluded by stating that "we are definitely diverse, but there is no inclusion" and that she "desire[s] greatly to have a

---

[4] The Anesthesia Department also included Dr. Jeff Semler. *See* (Doc. 49) at 7, ¶ U; (Doc. 51) at 10.

positive working relationship with [her] team members." *Id.* Plaintiff did not explicitly state that her coworkers discriminated against her or harassed her based on her race or color. *Id.* at 2-3.

Dr. Christensen responded to that email the same day. *Id.* at 1-2. Dr. Christensen acknowledged that Plaintiff "might have some legitimate concerns." *Id.* at 1. Dr. Christensen addressed the issue of breaks noting that "[t]he Union states that your break should not be taken in the middle of patient care...." *Id.* "So unless the case ... is a very long case [Plaintiff is] expected as a professional to finish the care [she] instituted with the patient." *Id.* Dr. Christensen also noted that "[t]here is no doubt tension in the anesthesia department which is precisely why changes are being made," including that "the provider that starts the cases should finish them unless it is a long case...." *Id.* Finally, Dr. Christensen noted that inclusion "is to give opportunity to all of diverse background," but Plaintiff has the responsibility to develop personal relationships with her colleagues and coworkers "for the good of the patient." *Id.*

Dr. Christensen then spoke with Dr. Gonzalez and Dr. Rossini "to address complaints regarding their behavior, including speaking loudly in meetings and interrupting [Plaintiff] when she was speaking." (Doc. 36-5) at ¶ 10.

Sometime in late July 2014, Plaintiff again met with Ms. Holona and advised Ms. Holona that she wanted to file an EEO complaint based on race and color discrimination.[5] (Doc. 49-1) at 20, ¶ E.i.d. Ms. Holona did not inform management about her interactions with Plaintiff regarding speaking with an EEO counselor. (Doc. 51-1) at 8, ¶¶ 16 and 17.

---

[5] Ms. Holona, on the other hand, testified at the EEOC hearing that Plaintiff did not indicate to her that she contemplated filing an EEO complaint. (Doc. 42-2) at 5.

On August 8, 2014, Plaintiff was assigned a thyroidectomy case that began at 7:30 a.m. (Doc. 36-2) at 2, depo. at 79. Plaintiff used the restroom prior to the start of that surgery. *Id.* at depo. 80. At 9:00 a.m., Plaintiff telephoned Dr. Gonzalez, who was "covering the board or supervising," to request a break. *Id.* at 80-81. Dr. Gonzalez responded that he would "see about it…." *Id.* at 81. When Dr. Gonzalez did not relieve Plaintiff, she called Dr. Gonzalez, again, at about 9:15 a.m. *Id.* Dr. Gonzalez indicated he was busy and hung up on Plaintiff. *Id.* After waiting some more, Plaintiff called the tour supervisor, but she could not help Plaintiff. (Doc. 36-3) at 3. Plaintiff then called Dr. Rivera, who "was doing a case," to request that he ask Dr. Gonzalez to provide her with a break, which Dr. Rivera agreed to do. *Id.* At about 10:00 a.m., Plaintiff went to where Dr. Rivera was working on his case and asked him if he had talked to Dr. Gonzalez. *Id.* Dr. Rivera said he was busy, and Plaintiff yelled that she needed to go the bathroom. *Id.*

Plaintiff then returned to her anesthetized patient and asked the surgeons on her case if she could step out to use the restroom. *Id.* Plaintiff told the surgeons that the patient was stable. *Id.* The surgeons agreed to allow Plaintiff to use the restroom. *Id.* Consequently, at about 10:00 a.m., Plaintiff left the room for no more than five minutes to go to the restroom.[6] *Id.*; (Doc. 49-1) at 15 ¶ ii.a. A nurse watched the patient's monitors while Plaintiff went to the restroom. (Doc. 36-3) at 3. However, no anesthesia provider attended the anesthetized patient during that

---

[6] Contrary to her own deposition testimony, Plaintiff attested in an affidavit that Dr. Gonzalez refused to allow her to take "a restroom break ***even four and one half (4.5) hours*** into a surgical procedure on August 8, 2014." (Doc. 49-1) at 4, ¶ c. According to Plaintiff's deposition testimony, she went to the restroom before 7:30 a.m. and then again at 10:00 a.m., approximately a 2.5 hour interval. *See* (Doc. 36-2) at 2, depo. at 80 ("Q. Would it have been possible to use the restroom during that time before the procedure began at 7:30 at any point? A. And I did, yes."); and (Doc. 36-2) at 4, depo. at 94 ("Q. And then you left to go to the restroom sometime around 10:00 a.m.? A. That sounds reasonable. Thank you for correcting me on the times.").

time. (Doc. 36-2) at 4, depo. at 95-96. According to Plaintiff, she left during the safest part of "a relatively low-risk" procedure, "at or around the half-way point of its expected duration." (Doc. 49-1) at 15-16.

Later on August 8, 2014, Dr. Christensen received a report that Plaintiff had left an anesthetized patient in the operating room "to use the restroom without obtaining coverage from a qualified anesthesia provider." (Doc. 36-5) at ¶ 11. After learning about the incident, Dr. Christensen spoke with the surgeons on Plaintiff's case and Silvia Zarate, a registered operating room nurse, who provided a written account of the incident to her supervisor. *Id.* at ¶¶ 12 and 13. Dr. Rivera also spoke with Dr. Christensen about a conversation he had with Dr. Gonzalez and Plaintiff about breaks. (Doc. 49-1) at 27, ¶ 21. Dr. Rivera told Dr. Christensen that he thought Plaintiff "did not fit in here because [the Anesthesia Department is] always short-staffed and simply cannot take breaks when [staff] want them, if there are patients that need [staff]." *Id.*

Dr. Christensen determined that Plaintiff's action on August 8, 2014, violated GIMC policy and the professional standards established by the American Association of Nurse Anesthetists (AANA). (Doc. 36-5) at ¶ 14. GMIC policy states:

> For all anesthetics initiated by or involving a member of the anesthesia service, an anesthesiologist or CRNA will be present in the room throughout the conduct of all general anesthetics (GA), regional anesthetics (RA), or monitored anesthetic care (MAC). An exception is made when there is a direct hazard to the anesthetist, in which case some provision for monitoring the patient must be made.

(Doc. 36-8) at 1, ¶ III(1). AANA Standard V states that "[t]he CRNA should attend to the patient continuously until the responsibility of care has been accepted by another anesthesia professional." *Id.* at 2.

Dr. Christensen believed that Plaintiff's conduct in leaving an anesthetized patient unattended by a qualified anesthesia provider was a threat to patient safety and exhibited poor judgment. Even if a patient is stable, the

9

patient's status can change at any second. For example, if the anesthesia wore off, the patient could twitch or move, which could result in injury to the patient during the surgery. Even if the surgeons are present, they are occupied with an operation requiring intensive concentration and are not monitoring the anesthesia. Operating Room Nurses or other O.R. staff are not qualified to administer anesthesia or monitor an anesthetized patient.

(Doc. 36-5) at ¶ 15.

For the foregoing reasons, Dr. Christensen decided on August 8, 2014, to terminate Plaintiff "during her probationary period based on her unacceptable conduct in leaving an anesthetized patient unattended by a qualified anesthesia provider." *Id.* at ¶ 16. Although Dr. Christensen was "aware of prior complaints made by staff members regarding Plaintiff's conduct, including her responsiveness when on call and hostility to coworkers … the deciding factor in" Dr. Christensen's decision to terminate Plaintiff was the August 8, 2014, incident. *Id.* at ¶ 17. Dr. Christensen believed that Plaintiff's conduct "represented a threat to patient safety and warranted termination." *Id.*

Although both Dr. Christensen and Dr. Rivera apparently requested a letter of termination from Ms. Holona, Dr. Christensen alone made the decision to terminate Plaintiff for her unacceptable conduct on August 8, 2014. *See* (Doc. 36-5) at ¶ 16; (Doc. 42-1) at 5, ¶ 15; (Doc. 49-1) at 26-27, ¶ 20; (Doc. 51-1) at 7, ¶¶ 14 and 15. Dr. Christensen signed the August 13, 2014, letter of termination as the GIMC clinical director. (Doc. 36-1) at 1-2. The letter notes Plaintiff's probationary status and states that Plaintiff, a Nurse Anesthetist, is "being terminated because of unacceptable conduct." *Id.* at 1. The letter, however, states in the second paragraph that Plaintiff's "unacceptable performance indicates" Plaintiff is "not suitable to effectively perform the duties of a Nurse Anesthetist." *Id.* (emphasis added). Additionally, the letter states in the third paragraph that Plaintiff does "not meet the final criteria of [her] appointment as a Nurse Specialist to warrant continued employment." *Id.* (emphasis added). Dr. Christensen

amended the termination letter on August 26, 2014, to correct the above statements in the second and third paragraphs to refer, respectively, to "unacceptable conduct" and "Nurse Anesthetist." (Doc. 36-1) at 3. On August 18, 2014, Plaintiff complained to Defendant's EEO person that her termination was discriminatory and retaliatory. (Doc. 36) at 10, ¶ 55.

According to Dr. Christensen, she was unaware at the time she terminated Plaintiff that Plaintiff "believed that she was being harassed or discriminated against based on her race or color." (Doc. 36-5) at ¶ 22. Dr. Christensen also was not aware of any reports Plaintiff made to management concerning "discrimination or harassment based on her race or color." *Id.* Indeed, Dr. Christensen was unaware that Plaintiff was considering filing an EEO complaint. *Id.* In sum, at the time Dr. Christensen terminated Plaintiff, Dr. Christensen "was not aware of any EEO activity by [Plaintiff] or any actions taken by [Plaintiff] to report discrimination or harassment on account of her race or color." *Id.* at ¶ 23.

The Court notes that Plaintiff cites affidavit statements by Dr. Rivera made in response to the question of whether race or color was a factor in Plaintiff's termination. (Doc. 49-1) at 27. As to the race factor, Dr. Rivera responded, "It was a personality issue, but probably a race issue as well, but I am not so sure about the last one." *Id.* at ¶ 23. Dr. Rivera explained that "[n]o one wanted to talk to [Plaintiff]" and that "she likes to harass the Anesthesia providers." *Id.* With respect to whether color was a factor in Plaintiff's termination, Dr. Rivera stated, "[P]robably yes, but I am not sure of it." *Id.* at ¶ 24. Dr. Rivera further stated that he "spoke to an HR person here and they said they felt it was probably something about the race, but she was just supposing."[7] *Id.*

---

[7] Ms. Holona testified at the EEOC hearing that she did not tell Dr. Rivera that she believed Plaintiff may have been discriminated against because of her race or color. (Doc. 42-2) at 6.

Moreover, Plaintiff cites Dr. Rivera's affidavit response to the question if he felt that the actions by Dr. Gonzalez, Dr. Rossini, and Ms. Jones were based on Plaintiff's race, color, or EEO activity. *Id.* at 25, ¶ 16. Dr. Rivera responded, "I am not quite sure, but I think it could be probable." *Id.* Dr. Rivera described how Dr. Gonzalez, Dr. Rossini, and Ms. Jones would not talk to Plaintiff and would walk away from Plaintiff when she was talking to them. *Id.* Ms. Jones also would look at Plaintiff "with a horrible expression." *Id.* at 25-26, ¶ 16. Dr. Rivera concluded, "I think this was about personality, but also probably about race (iam [sic] not sure about this last thing)." *Id.* at 26, ¶ 16. When further asked if he felt race was a factor, Dr. Rivera responded, "I do not know, I am not sure." *Id.* at ¶ 17.

In addition, Plaintiff cites Dr. Rivera's EEOC hearing testimony in which he indicated that if Plaintiff was not subject to harassment Plaintiff would not have been terminated. (Doc. 49-1) at 32-33.

"To defeat a motion for summary judgment, evidence … must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The above affidavit statements and testimony by Dr. Rivera regarding whether race or color was a factor in Plaintiff's termination or in the behavior exhibited by Dr. Gonzalez, Dr. Rossini, and Ms. Jones clearly constitute "speculation, conjecture, or surmise." *Id.* Also, the hearsay statement from the HR person, Ms. Holona, regarding a racial factor in Plaintiff's termination constitutes impermissible hearsay. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (citation omitted) (acknowledging that in summary judgment context "[h]earsay testimony cannot be considered because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill'"). For the above reasons, the Court will not consider Dr. Rivera's affidavit responses and testimony regarding

whether Plaintiff's race or color were a factor in Plaintiff's termination or in the behavior exhibited by Dr. Gonzalez, Dr. Rossini, and Ms. Jones.

*II. The Complaint for Title VII Discrimination and Retaliation (Complaint) (Doc. 1)*

Plaintiff alleges in her First Cause of Action that Defendant violated Title VII when it (1) discriminated against her on the basis of race and color by terminating her employment, and (2) created a racially hostile work environment. Finally, Plaintiff alleges in her Second Cause of Action that Defendant violated Title VII by unlawfully retaliating against her when she complained about race and color discrimination, and a racially hostile work environment.

*III. The Motion for Summary Judgment*

Defendant moves for summary judgment on both the First and Second Causes of Action. Defendant argues first that Plaintiff has not established it terminated Plaintiff's employment based on either unlawful discrimination or retaliation. Second, Defendant argues that Plaintiff has not demonstrated it created a racially hostile work environment. Plaintiff opposes the Motion for Summary Judgment in its entirety.

*IV. Standard of Review*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most

favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

## V. Discussion

As an initial matter, Defendant argues that the Court should deem its asserted Undisputed Material Facts (UMFs) undisputed because Plaintiff has not specifically controverted them as required by D.N.M. LR-Civ 56.1(b). Local Rule 56.1(b) states that in a response to a motion for summary judgment the non-movant "must state the **number** of the movant's fact that is disputed" and "[e]ach additional fact must be **lettered** and must refer with particularity to those portions of the record upon which the non-movant relies." Furthermore, "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M. LR-Civ 56.1(b).

Here, Plaintiff does not address the numbered UMFs individually. Instead, Plaintiff groups some of Defendant's numbered UMFs and then lists under each group lettered facts which purport to be additional facts or a basis to dispute the UMFs. "[T]he additional facts should have been put forth in a separate portion of Plaintiff's response instead of intermixed with Plaintiff's response to the [UMFs]." *Wells v. HI Country Auto Grp.*, 2014 WL 12623030, at *2 (D.N.M.). The Court notes it permitted Plaintiff to file the instant amended response because her original response (Doc. 40) failed to comply with Local Rule 56.1(b). *See* (Doc. 48). Despite the confusing response to the UMFs, in the interest of justice, the Court finds it sufficient to not deem those UMFs undisputed. *See* D.N.M. LR-Civ. 1.7 (providing that Local Rules "may be waived by a Judge to avoid injustice"). However, the Court admonishes Plaintiff that it will strictly enforce any further violations of the Local Rules.

*A. Whether Defendant Terminated Plaintiff for Discriminatory or Retaliatory Reasons*

"To prevail on a Title VII discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). "When, as here, the plaintiff presents only circumstantial evidence of discrimination, [courts] analyze the claim under the *McDonnell Douglas* burden-shifting framework." *Id.* Under the *McDonell Douglas* framework, "the plaintiff has the initial burden of establishing a prima facie case of discrimination." *Id.* "If the plaintiff makes this [prima facie] showing, the burden shifts to the employer to assert 'a legitimate nondiscriminatory reason for its actions.'" *Id.* (citation omitted). "If the employer does so, 'the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext.'" *Id.* (citation omitted). "As with Title VII discrimination claims, [courts] apply the *McDonnell Douglas* burden-shifting framework to Title VII … retaliation claims that are based on indirect evidence." *Id.* at 1042.

*1. First Step in McDonnell Douglas Framework: Prima Facie Cases of Discrimination and Retaliation*

*a. Prima Facie Case of Discrimination Based on Race and Color*

To demonstrate a *prima facie* case of Title VII discrimination based on race or color, Plaintiff must show that "(1) [she] was a member of a protected class; (2) [she] was qualified and satisfactorily performing [her] job; and (3) [she] was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis,* 366 F.3d 1168, 1175 (10th Cir. 2004). The parties do not dispute that Plaintiff has met the first two prongs of a *prima facie* case of discrimination. The parties dispute whether Plaintiff has met the third prong, whether Plaintiff "was terminated under circumstances giving rise to an inference of discrimination." *Id.*

A plaintiff "can establish evidence of the third prong in various ways, such as 'actions or remarks made by decisionmakers,' 'preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'" *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (citation omitted). Plaintiff contends she has demonstrated that she meets the third prong in two ways.

First, Plaintiff argues that she "has identified comparator employees who were treated more favorably than her under similar circumstances." (Doc. 49) at 15. This argument, however, pertains to the pretext step of the *McDonnell Douglas* framework. *See Payan v. United Parcel Serv.*, 792 Fed. Appx. 634, 646 (10th Cir. 2019) (noting that "plaintiff may show pretext by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness") (citation omitted). To the extent Plaintiff argues that Defendant simply gave "preferential treatment" to non-African American employees, Plaintiff fails to state who those non-African American employees are. If Plaintiff refers to the fact that Dr. Gonzalez, Dr. Rossini, and Ms. Jones, all non-African Americans, only gave breaks to each other, it is undisputed that they, likewise, did not provide breaks to Dr. Rivera, a non-African American employee. Thus, Plaintiff has not shown that Dr. Gonzalez, Dr. Rossini, and Ms. Jones provided preferential treatment only to non-African Americans.

Second, Plaintiff argues that "it is unquestionably discriminatory to remove Plaintiff for not 'getting along'" with her colleagues when they "ostracized" her and "made wholly unprompted racially offensive statements towards Plaintiff." (Doc. 49) at 16. On the other hand, as Defendant asserts "Plaintiff has presented no evidence that Dr. Christensen, the terminating official, harbored racial animus toward Plaintiff" or that Dr. Christensen made "racially hostile

or insensitive remarks" to Plaintiff or anyone else. (Doc. 36) at 13. *See Drury v. BNSF Ry. Co.*, 657 Fed. Appx. 785, 790 (10th Cir. 2016) (rejecting argument of inference of discrimination when plaintiff never heard supervisor involved in termination make racist comments, i.e., harbor racial animus).

As noted above, Defendant does not dispute that Plaintiff was a member of a protected class and, significantly, that Plaintiff was qualified and performing her job satisfactorily. In fact, there are no complaints whatsoever, prior to August 8, 2014, about Plaintiff's performance as a CRNA. While Dr. Christensen attributes the cause to terminate solely to the events occurring on August 8, 2014, and points to the AANA and GIMC policies, Dr. Christensen knew about the general animosity by members of the Anesthesiology Department toward Plaintiff, the only African American in that Department. Dr. Christensen also was aware of Plaintiff's perception of discrimination as early as July 28, 2014, when she and Dr. Rivera and Dr. Christensen received an email from Plaintiff complaining of, among other concerns, a hostile environment.

Nonetheless, Dr. Christensen decided to terminate Plaintiff despite her seemingly best efforts not to violate the AANA and GIMC policies. Indeed, (1) Plaintiff took a restroom break prior to 7:30 am; at approximately 9:00 a.m., Plaintiff contacted Dr. Gonzales to request a break but was not relieved and when she asked him again, he hung up the phone; and at 10:00 a.m. (no less than two and a half hours after her last restroom break and an hour after her first request for a break), Plaintiff determined the patient was safe enough to ask again for a break, and the surgeons agreed; (2) the surgeons gave Plaintiff permission to take a break, and Plaintiff relied on that permission before leaving her duty station; and (3) Plaintiff's break was reasonably brief.

This Court must view the above evidence in the light most favorable to Plaintiff and draw all reasonable inferences in Plaintiff's favor. In doing so, the Court concludes that a reasonable

jury could not find that Dr. Christensen terminated Plaintiff "under circumstances giving rise to an inference of discrimination." *Salguero*, 366 F.3d at 1175. Dr. Christensen's decision to terminate Plaintiff was precipitous perhaps, insofar as she did not consider the broader and mitigating circumstances surrounding the events on August 8, 2014, such as Plaintiff's performance before that date, or the circumstances surrounding Plaintiff's reported concerns prior to that date. Even so, Plaintiff has not presented enough evidence to establish that Dr. Christensen's decision was based on Plaintiff's race. Therefore, Plaintiff has not demonstrated a *prima facie* case of discrimination based on race or color. Defendant is entitled to summary judgment on Plaintiff's Title VII discrimination claim.

### b. Prima Facie Case of Retaliation

"To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) engagement in activity protected under Title VII; (2) a materially adverse employment action; and (3) a causal connection between the protected activity and the materially adverse action." *Robinson v. Barrett*, 823 Fed. Appx. 606, 610 (10th Cir. 2020).

Under the first prong of a *prima facie* case of retaliation, protective activities "can range from filing formal charges to voicing informal complaints to superiors." *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1171 n. 2 (10th Cir. 2020). "Although 'protected activity' can include voicing informal complaints to supervisors, ... 'to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice.'" *Rangel v. Sanofi Aventis U.S., LLC*, 507 Fed. Appx. 786, 791 (10th Cir. 2013) (citations omitted). "A vague reference to discrimination and harassment without any indication that this misconduct was motivated by [race or color] does not constitute protected activity and will not support a retaliation claim." *Id.* (citation omitted). "An

employer cannot engage in unlawful retaliation if it does not know that the employee at least in part is engaging in protected activity." *Id.* at 192.

Here, Plaintiff argues that she engaged in protected activity by making several informal complaints to supervisors of discrimination based on race and color, including (1) Plaintiff's March 2014 objection during Mr. Miller's workshop regarding use of the "race card" analogy; (2) Plaintiff's March 2014 email to Mr. Miller and Dr. Rivera complaining about Mr. Miller's use of the "race card" analogy at his workshop; (3) Plaintiff's complaint to Dr. Rivera in April 2014 about Mr. Mota's use of the word "Nigga;" (4) Plaintiff's April 2014 complaint to Ms. Darder-Bonilla about Ms. Andy's remarks about her grandchildren's fear of African Americans; (5) Plaintiff's June 16, 2014, email to Dr. Rivera in which Plaintiff makes several complaints and refers to herself as an "A-A female;" and (6) Plaintiff's July 28, 2014, email to Dr. Rivera and Dr. Christensen in which Plaintiff complains about a "hostile work environment" and lack of inclusion despite diversity.

Defendant argues that, except for Plaintiff's July 28, 2014, email to Dr. Rivera and Dr. Christensen, Dr. Christensen, as the terminating official, was not aware of Plaintiff's complaints regarding race and color discrimination. The Court agrees with Defendant. A reasonable jury viewing the evidence in the light most favorable to Plaintiff could not find that Dr. Christensen was aware of Plaintiff's complaints regarding race and color discrimination prior to July 28, 2014. Nonetheless, a reasonable jury reading Plaintiff's July 28, 2014, email as a whole and in the light most favorable to Plaintiff, the only African American in the Anesthesiology Department, could find that the email constitutes a complaint about a hostile work environment based on a lack of inclusion despite the diversity in the department. As such, the July 28, 2014, email does not contain a merely "vague reference to discrimination and harassment without any

indication that this misconduct was motivated by [race or color]...." *Rangel,* 507 Fed. Appx. at 791. Hence, Plaintiff has established that she engaged in a protected activity when she sent the July 28, 2014, email to Dr. Rivera and Dr. Christensen, the first prong of a *prima facie* case of retaliation.

Although Plaintiff's Complaint does not explicitly allege that the material adverse action at issue in the retaliation claim is Plaintiff's termination, the Court reasonably infers that such is the case. Termination certainly meets the material adverse action prong of a *prima facie* case of retaliation.

With respect to causal connection, the last prong of a *prima facie* case of retaliation, a plaintiff can establish a causal connection with "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Williams v. W.D. Sports, N.M., Inc.,* 497 F.3d 1079, 1091 (10th Cir. 2007). "[U]nless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999).

Here, only a matter of two weeks separated the July 28, 2014, email to Dr. Rivera and Dr. Christensen and the August 13, 2014, termination letter. That temporal proximity is sufficient to establish a causal connection between the protected activity and the materially adverse action. *See Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1171-72 (10th Cir. 2006) (finding evidence that supervisor "knew" of the protected activity, at most, six weeks prior to termination allowed for inference of causation).

In sum, the Court concludes that Plaintiff established a *prima facie* case of retaliation. The Court, therefore, moves on to address the second step in the *McDonnell Douglas* framework as it pertains to the retaliation claim.

### 2. Second Step in McDonnell Douglas Framework: Legitimate Nonretaliatory Reason for Plaintiff's Termination

Plaintiff does not dispute that Defendant has carried its burden of proffering a legitimate nonretaliatory reason for terminating Plaintiff. Namely, Defendant asserts it terminated Plaintiff because she "left an anesthetized patient during an operation without obtaining appropriate coverage from a qualified anesthesia provider." (Doc. 36) at 14-15. The burden now shifts to Plaintiff to demonstrate that this legitimate nonretaliatory reason for terminating her employment was a pretext for retaliation.

### 3. Third Step in McDonnell Douglas Framework: Pretext for Retaliation

Generally, "[a] plaintiff may show pretext by demonstrating the proffered reason is factually false, or that [retaliation] was a primary factor in the employer's decision." *Payan*, 792 Fed. Appx. at 645 (citation omitted). Often, a plaintiff accomplishes this by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action[s] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons." *Id.* (citation omitted). However, "[m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Id.* (citation omitted).

To assess pretext, courts "consider the evidence of pretext in its totality." *Id.* (citation omitted). Courts "examine the facts as they appear *to the person making the decision* and do not look to the plaintiff's subjective evaluation of the situation." *Id.* (citation omitted). "Instead of asking whether the employer's reasons were 'wise, fair[,] or correct,' the relevant inquiry is

whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Id.* (citations omitted).

Here, it is undisputed that Dr. Christensen investigated the August 8, 2014, incident by speaking with the surgeons on Plaintiff's case, Ms. Zarate, and Dr. Rivera. A jury viewing that evidence in the light most favorable to Plaintiff could reasonably infer that Dr. Christensen knew that Plaintiff had not taken a break in one and a half hours when she began asking for a break at 9:00 a.m.; Plaintiff asked five times for a break in the course of an hour; and that the surgeons on her case gave Plaintiff permission to take a break. The fact that the surgeons allowed Plaintiff to take a break reasonably suggests that the patient was sufficiently stable for Plaintiff to take a brief break, which she did. While it is undisputed that Plaintiff violated the policies upon which Dr. Christensen relies for her termination decision, it is also undisputed that Plaintiff, in good faith, tried not to violate those policies. Ultimately, Plaintiff had no choice but to violate those policies, which she did with the permission of her surgeons. Notably, this was the first time Plaintiff left an anesthetized patient without anesthesiology provider coverage while she was employed at GIMC, and no one had previously complained about Plaintiff's work performance as a CRNA.

Viewing the totality of these circumstances, including that Plaintiff had previously complained to Dr. Christensen about how badly other members of the Anesthesiology Department treated her, the only African American in that Department, in the light most favorable to Plaintiff and drawing all reasonable inference in Plaintiff's favor, a reasonable jury could not find that Dr. Christensen honestly believed that Plaintiff should be terminated for leaving an anesthetized patient without anesthesiology provider coverage on one occasion under the conditions present on August 8, 2014. At the very least, Plaintiff has presented evidence of a

22

genuine issue of material fact related to the question of pretext and whether "[retaliation] was a primary factor" in Dr. Christensen's termination decision. *See Payan,* 792 Fed. Appx. at 645 (citation omitted). Summary judgment, therefore, is not appropriate with respect to Plaintiff's Title VII retaliation claim.

### B. Whether Plaintiff was Subject to a Racially Hostile Work Environment

To survive summary judgment on a Title VII hostile work environment claim, "the record must support an inference of a racially hostile work environment *and* a basis for employer liability." *Ford v. West,* 222 F.3d 767, 775 (10th Cir. 2000).

To carry her burden of demonstrating that Defendant subjected her to a racially hostile work environment, Plaintiff must show: "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1222 (10th Cir. 2015) (citation omitted).

With respect to employer liability, an employer can be liable for a hostile work environment under a negligence theory "where the employer knew, or should have known, about the [racial harassment] *and* failed to respond in a reasonable manner…." *Ford,* 222 F.3d at 776. Put another way, a plaintiff must demonstrate that the employer "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Id.* (citation omitted). "A plaintiff demonstrates actual employer knowledge where the plaintiff has reported harassment to management-level employees." *Id.* On the other hand, "[a]n employer may be deemed to have constructive knowledge of racial harassment where the pervasiveness of the harassment supports an inference of employer knowledge." *Id.* In that case,

23

"[o]nly when the acts of harassment are 'so egregious, numerous, and concentrated as to add up to a campaign of harassment' will the employer be liable for failure to discover the harassment." *Id.* (quotation mark and citations omitted). Finally, "an employer is only liable for … harassment committed by a particular employee if the employer could have prevented the harassment perpetrated by that employee," i.e., courts cannot "automatically lump all harassing conduct together when analyzing an employer's liability for a … hostile work environment." *Macias v. Sw. Cheese Co., LLC*, 181 F. Supp. 3d 883, 891 (D.N.M. 2016). The Court will address the issue of employer liability first. *See Ford*, 222 F.3d at 775 (stating, "Because we dispose of Plaintiff's claim based on the absence of employer liability, we need not resolve, apart from the question of employer liability, the issue of the presence of a hostile work environment").

### 1. *Employer Liability: Negligence by Employer*

#### a. *Reported Incidents*

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has presented evidence that she reported the following incidents to management: (1) Ms. Hamilton's questions and comments about why Plaintiff was working at GIMC; (2) comments by Mr. Miller about playing the "race card;" (3) Mr. Mota's use of "Nigga;" (4) Ms. Andy's comments about how her grandchildren react negatively to African Americans; and (5) Dr. Gonzalez, Dr. Rossini, and Ms. Jones's rude behavior toward Plaintiff as well as their refusal to give Plaintiff breaks. One could reasonably infer from the evidence of that reporting that Defendant had actual notice of the above questions, comments, and behavior.

Nonetheless, with respect to Ms. Hamilton, it is undisputed that her questions and comments did not refer to Plaintiff's race or color. A reasonable jury viewing those questions

and comments in the light most favorable to Plaintiff could not infer racial harassment from those questions. Indeed, no reasonable jury could find that Ms. Hamilton's questions and comments were not relevant to any newly hired GIMC employee. Moreover, Ms. Hamilton left GIMC a month after Plaintiff began working at GIMC. Accordingly, those questions and comments ceased at that time. When the offending employee leaves employment, the employer need not remedy a situation that will no longer occur. *Cf. Stuyvenberg v. GC of Appleton, Inc.*, 2010 WL 3766529, at *4 (E.D. Wis.) (holding that "when the harassment appears unlikely to be repeated due to [a complaining] employee's apparent resignation, the employer is relieved of its duty to take additional remedial measures"). For the above reasons, Defendant cannot be liable for Ms. Hamilton's questions and comments.

Although Mr. Miller, who was not a GIMC employee, certainly referenced race by talking about the "race card" at his workshop, he responded to Plaintiff's complaint about the "race card" analogy by apologizing to Plaintiff and stating he would not use the "race card" analogy. A reasonable jury could not find that Mr. Miller's response to Plaintiff's complaint was inadequate or unreasonable. In fact, it is undisputed that Plaintiff never saw Mr. Miller again. Furthermore, Plaintiff has not established that it was unreasonable for Defendant not to take further action with respect to a non-GIMC employee. Under these circumstances, Defendant is not liable for Mr. Miller's use of the "race card" analogy.

As to Mr. Mota's references to "Nigga," like Mr. Miller, it is undisputed that Mr. Mota ceased making those references in front of Plaintiff once she complained to him about his use of that word. Nevertheless, "[t]he fact that harassment stops is … not a way of excusing the *obligation* to remedy. Once an employer knows or should know of harassment, a remedial obligation kicks in." *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1528 (9th Cir. 1995), *as*

*amended* (Apr. 24, 1995). "Effectiveness [of the employer's remedy] will be measured by the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others." *Id.* Hence, "[i]f 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Id.* at 1528-29. Given that Defendant instituted no remedy to deter Mr. Mota's possible future use of "Nigga" in Plaintiff's presence, a reasonable jury could find Defendant liable for Mr. Mota's conduct.

In addition, viewing the evidence related to Ms. Andy's comments about how her grandchildren react negatively to African Americans in the light most favorable to Plaintiff, a reasonable jury could find that Defendant did not respond to Plaintiff's complaint about those comments. Accordingly, a reasonable jury could find Defendant liable for those comments by Ms. Andy.

Next, although Dr. Gonzalez and Dr. Rossini acted rudely toward Plaintiff by speaking loudly in meetings and interrupting Plaintiff, it is undisputed that Dr. Christensen met with Dr. Gonzalez and Dr. Rossini about that behavior. Plaintiff, however, has not presented evidence establishing a genuine issue of fact that Dr. Christensen's response was unreasonable. Specifically, Plaintiff has not presented evidence that after this conversation, Dr. Gonzalez and Dr. Rossini continued to speak loudly in meetings and interrupt Plaintiff, i.e., that Dr. Christensen's response was not effective as to those behaviors. *See, e.g., Jeffries v. State of Kan.*, 147 F.3d 1220, 1230 (10th Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (holding that supervisor took "action reasonably calculated" to prevent further hugs and conduct never recurred). Consequently, Defendant cannot be liable for that conduct.

With respect to other rude behavior toward Plaintiff, such as Dr. Gonzalez, Dr. Rossini, and Ms. Jones ignoring Plaintiff and Ms. Jones' "horrible" facial expressions, Defendant has not presented evidence that Dr. Christensen spoke to Dr. Gonzalez, Dr. Rossini, and Ms. Jones about that specific behavior. In fact, Dr. Gonzalez and Ms. Jones refused to sign Dr. Rivera's letter of expectations. A reasonable jury viewing this evidence in the light most favorable to Plaintiff could find that Defendant did not reasonably respond to the fact that Dr. Gonzalez, Dr. Rossini, and Ms. Jones ignored Plaintiff, and that Ms. Jones made "horrible" facial expressions in Plaintiff's presence. Thus, Defendant could be liable for that conduct.

Finally, it is undisputed that Dr. Christensen addressed Plaintiff's complaint about not getting breaks when she responded to Plaintiff's July 28, 2014, email. Dr. Christensen stated in that email that Plaintiff was entitled to breaks, but not in the middle of patient care. Significantly, Dr. Christensen did not state that she would speak with Dr. Gonzalez, Dr. Rossini, and Ms. Jones about the break issue. Instead, Dr. Christensen told Plaintiff it was her responsibility to develop personal relationships. A reasonable jury could find that this response was not reasonably calculated to end Dr. Gonzalez, Dr. Rossini, and Ms. Jones' refusal to give breaks to Plaintiff. In fact, on August 8, 2014, Dr. Gonzalez did not give Plaintiff a break when she requested one. The Court, therefore, concludes that Defendant could be liable for Plaintiff's assertion of racial harassment based on the failure of Dr. Gonzalez, Dr. Rossini, and Ms. Jones to give Plaintiff breaks.

### b. Unreported Incidents

It is undisputed that Plaintiff did not report the following incidents to management: (1) Dr. Gonzalez's behavior when he first met Plaintiff prior to Defendant hiring her; (2) Ms. Joes' reference to GIMC African American physicians as "sistas" and "brothas;" (3) Ms. Andy's

reference to African Americans as "you people;" (4) Ms. Rivera's comment that Plaintiff is a "chocolate doll;" and (5) Dr. Brueckner's comments about how people perceived her as a child due to her curly hair and "Black nose." Viewing those unreported incidents in the light most favorable to Plaintiff, a reasonable jury could find that the egregious/concentrated nature of the unreported incidents as well as the number of those incidents support an inference of employer knowledge, i.e., constructive knowledge, of racial harassment. Given that Defendant should have known about the above racial harassment, Defendant can be liable for its failure to discover that harassment and reasonably respond to it.

2. *Racially Hostile Work Environment*

The following circumstances remain for which Defendant could be liable under a hostile work environment claim: (1) Mr. Mota's use of "Nigga;" (2) Ms. Andy's comments about how her grandchildren react negatively to African Americans; (3) Dr. Gonzalez, Dr. Rossini, and Ms. Jones' rude behavior toward Plaintiff, including ignoring her and Ms. Jones making "horrible" facial expressions; (4) the refusal by Dr. Gonzalez, Dr. Rossini, and Ms. Jones to provide Plaintiff with breaks; (5) Dr. Gonzalez's behavior when he first met Plaintiff prior to Defendant hiring her; (6) Ms. Joes' reference to GIMC African American physicians as "sistas" and "brothas;" (7) Ms. Andy's reference to African Americans as "you people;" (8) Ms. Rivera's comment that Plaintiff is a "chocolate doll;" and (9) Dr. Brueckner's comments about how people perceived her as a child due to her curly hair and "Black nose."

As an initial matter, the Court notes that the parties do not dispute that Plaintiff is a member of a protected group who was subjected to unwelcome harassment, the first two elements of a hostile work environment claim. The parties, however, dispute that (1) Plaintiff was subject to harassment based on race, and (2) racial harassment was so severe or pervasive as

to constitute an abusive working environment, the third and fourth hostile work environment elements.

### a. Third Element of Hostile Work Environment: Harassment Based on Race

Defendant first argues that Plaintiff has not presented evidence that the rude behavior by Dr. Gonzalez, Dr. Rossini, and Ms. Jones, i.e., ignoring Plaintiff and making "horrible" facial expressions, and the refusal by Dr. Gonzalez, Dr. Rossini, and Ms. Jones to provide Plaintiff with breaks were based on race or color. Indeed, it is undisputed that Dr. Gonzalez, Dr. Rossini, and Ms. Jones never made any racial comments to Plaintiff and did not provide breaks to Dr. Rivera, who is not African American. It is also undisputed that Plaintiff's coworkers in the Anesthesia Department complained about Plaintiff requesting excessive breaks while they were providing patient care. "As the Seventh Circuit explained, federal law 'does not guarantee a utopian workplace, or even a pleasant one.... [P]ersonality conflicts between employees are not the business of the federal courts.'" *Trujillo v. Univ. of Colorado Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (citation omitted). Plaintiff simply has not produced evidence from which a reasonable jury viewing the evidence in the light most favorable to Plaintiff could infer that Dr. Gonzalez, Dr. Rossini, and Ms. Jones harassed Plaintiff because of her race or color. Thus, Plaintiff has not met the third hostile work environment element as to the rude behavior by Dr. Gonzalez, Dr. Rossini, and Ms. Jones, i.e., ignoring Plaintiff and making "horrible" facial expressions, and the refusal of Dr. Gonzalez, Dr. Rossini, and Ms. Jones to provide Plaintiff with breaks.

Furthermore, with respect to Dr. Gonzalez's behavior when he first met Plaintiff prior to Defendant hiring her, Plaintiff simply has not produced evidence from which a reasonable jury viewing the evidence in the light most favorable to Plaintiff could infer that Dr. Gonzalez' rude

behavior at that time constituted harassment based on Plaintiff's race or color. Plaintiff, therefore, has not met the third hostile work environment element as to Dr. Gonzalez's behavior when he first met Plaintiff prior to Defendant hiring her.

### b. Fourth Element of Hostile Environment: Pervasive or Severe Racial Harassment

Next, the Court considers whether Mr. Mota's offensive language, Ms. Andy's comments about her grandchildren, Ms. Joes' reference to GIMC African American physicians as "sistas" and "brothas," Ms. Andy's reference to African Americans as "you people," Ms. Rivera's comment that Plaintiff is a "chocolate doll," and Dr. Brueckner's comments about how people perceived her as a child due to her curly hair and "Black nose" constitute pervasive or severe racial harassment, the fourth and final hostile work environment element.

Examining the pervasive aspect of the fourth element first, the Court concludes that viewing the totality of the above racially harassing incidents in the light most favorable to Plaintiff, a reasonable jury could find that the harassment was sufficiently pervasive "to alter a term, condition, or privilege of [Plaintiff's] employment and create an abusive working environment." *Lounds*, 812 F.3d at 1222.

With respect to the severity aspect of the fourth element, "a plaintiff must show an environment that was both objectively and subjectively hostile." *Payan*, 905 F.3d at 1170-71. It is undisputed that Plaintiff found the work environment subjectively hostile. Courts assess the "objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, *considering all the circumstances*." *Id.* (citation omitted). To make that assessment, courts "consider[ ] such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation omitted).

Here, it is undisputed that Mr. Mota's use of offensive language occurred an unspecified number of times in April 2014, but then stopped. It also is undisputed that Ms. Andy's comments about her grandchildren occurred once as well as Ms. Joes' reference to GIMC African American physicians as "sistas" and "brothas," Ms. Andy's reference to African Americans as "you people," Ms. Rivera's comment that Plaintiff is a "chocolate doll," and Dr. Brueckner's comments about how people perceived her as a child due to her curly hair and "Black nose." It is also undisputed that none of the above conduct was physically threatening but, instead, constituted mere utterances. Finally, Plaintiff has not submitted evidence that her work performance suffered as a result of that conduct. Although several of the above factors do not support objective racial hostility, considering the number of the incidents and all of the circumstances, a reasonable jury viewing the evidence in the light most favorable to Plaintiff could find those incidents were sufficiently severe "to alter a term, condition, or privilege of [Plaintiff's] employment and create an abusive working environment." *Lounds*, 812 F.3d at 1222.

Even so, the Court finds that Mr. Mota's conduct, in particular, requires separate consideration. The Tenth Circuit has recognized that a "matter[] courts frequently have found to be appropriate for jury consideration (and thus not appropriate for rejection at the summary-judgment phase) due to [its] potentially powerful race-based effect [is] the use of the word 'nigger '—more specifically, the variant, 'nigga'...." *Id.* at 1229; *see also id.* at 1230 (acknowledging that "perhaps no single act can more quickly alter the conditions of employment than the use of an unambiguously racial epithet such as nigger by a supervisor. This single incident might well have been sufficient to establish a hostile work environment") (citations omitted); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (observing that

"[w]hile there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum"). Viewing the nature of Mr. Mota's offensive language in the light most favorable to Plaintiff, the Court can only conclude that "a reasonable jury could find on this record that the subjective and objective effect of [Mr. Mota's] conduct was to pollute the environment with harassing conduct that was, *inter alia*, racially humiliating, offensive, or insulting." *Lounds*, 812 F.3d at 1232. In sum, Plaintiff has shown that a reasonable jury "could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Payan*, 905 F.3d at 1171 (citation omitted).

For the foregoing reasons, the Court concludes that the hostile work environment claim, as described above, survives summary judgment as well.

IT IS ORDERED that

1. Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. 36) is granted in part;

2. summary judgment will be granted in favor of Defendant on the Title VII claim based on race or color discrimination; and

3. that claim will be dismissed with prejudice.

UNITED STATES DISTRICT JUDGE