IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DOROTHY WHITAKER,

     Plaintiff,

vs.                                                                                 Case No. 18-cv-1046-KG-JFR

XAVIER BECERRA, SECRETARY
*U.S. Department of Health and Human Services,*

     Defendant,

ATTORNEY TRENT A. HOWELL,

     Intervenor.

<u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on: (i) Plaintiff Dorothy Whitaker's Motion to Throw

Out/Invalidate the Verbal Acceptance of Settlement Agreement (Doc. 91) (Motion to Invalidate);

(ii) Defendant Xavier Becerra's Cross Motion to Enforce the Settlement (Doc. 95) (Motion to

Enforce); and (iii) attorney Trent A. Howell's Motion to Enforce Attorney's Charging Lien

and/or to Intervene to Enforce Charging Lien (Doc. 86) (Motion to Intervene).

Ms. Whitaker's Motion to Invalidate is fully briefed and opposed by both Defendant

Becerra and Mr. Howell.[1] *See* (Docs. 95, 97, 100, 103, 104).  Defendant Becerra's Motion to

Enforce the Settlement is in effect opposed by Ms. Whitaker in her Reply to the Cross Motion to

Enforce.  (Doc. 100).  Mr. Howell's Motion to Intervene was preceded by a Claim and Notice of

Attorney's Charging Lien.  (Doc. 73).  His Motion is now fully briefed.  *See* (Docs. 73, 88, 89).

Plaintiff Whitaker has taken no position on the Motion to Intervene, and Defendant Becerra does

---

[1] Mr. Howell was granted leave to file a response to Ms. Whitaker's Motion to Invalidate.  (Doc. 93).

not oppose Mr. Howell's intervention but does oppose enforcement of the lien, at least before judgment has been entered. (Doc. 88). Having considered the briefing and the relevant law, the Court denies Plaintiff Whitaker's Motion to Invalidate the Settlement, grants Defendant Becerra's Cross Motion to Enforce the Settlement, and grants Mr. Howell's Motion to Intervene and Enforce the charging lien.

I.      *Background*

    Plaintiff brought this action against the Department of Health and Human Services (Department) alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and 1981a. (Doc. 1). On July 16, 2021, Ms. Whitaker, represented by her then-attorney Trent A. Howell, appeared before Magistrate Judge John F. Robbenhaar for a settlement conference with Defendant. (Doc. 72). After seven hours, the parties successfully reached an agreement to settle Ms. Whitaker's claim. *Id.*

    The settlement agreement provides Ms. Whitaker $650,000.00[2] in return for her agreement to dismiss all cases against the Department. (Doc. 95) Ex. 2. This agreement concludes a seven-year process since Ms. Whitaker's termination from Gallup Indian Medical Center, a procedure which has wound through a Department investigation, an Equal Employment Opportunity Commission administrative hearing, and the instant action in federal court. *See* (Doc. 86) at 3.

    The Court put the Settlement Agreement on the record at the Settlement Conference:

---

[2] The Court notes that by the terms of the Settlement Agreement, it is not confidential. *See* (Doc. 95) Ex. 2 at ¶ 19 ("Nothing in this Settlement Agreement shall be construed as a confidentiality provision.") and at ¶ 5 ("[N]one of the terms of the settlement agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action or proceeding *other than proceedings that may be necessary to consummate or enforce this settlement agreement*.") (emphasis added).

2

THE COURT: …the case has settled, the parties have reached an agreement. Plaintiff has accepted a settlement offer of $650,000. A release of claims that was produced by the Government will be completed and tendered by the defense, and apparently that's a form -- Mr. Howell, you probably know this -- but there's no editing or changing of the form permitted. So you'll have to fill out the form as it is.

(Doc. 95) Ex. 1 at 2:22–3:5 (Settlement Conference Transcript).

Ms. Whitaker, in an exchange with Judge Robbenhaar, stated her voluntary, oral assent to

the agreement.

THE COURT: … Ms. Whitaker, I have a few questions for you…. you don't appear to be under the influence of any drugs, alcohol, or medication that would impair or impede your ability to understand these proceedings. Is that correct?

MS. WHITAKER: Yes.

THE COURT:  All right. And Ms. Whitaker, can you affirm that you have been partaking in this process voluntarily?

MS. WHITAKER: Yes.

THE COURT:  And do you feel that anyone's forced you or threatened you to enter into this settlement agreement?

MS. WHITAKER: No.

THE COURT: All right. All right.

*Id.* at 3:6–25.

Because the conference was conducted remotely via Zoom video conferencing, the

Settlement Agreement was not immediately signed by the Plaintiff.  Instead, the parties agreed

that the Government would "add the number in to the settlement agreement" and "get it over to

Mr. Howell forthwith so that he can share it with Ms. Whitaker and we can obtain signatures."

*Id.* at 4:14–18.

The parties disagree as to exactly how familiar Ms. Whitaker was with the written release

and Settlement Agreement.  Ms. Whitaker alleges she did not receive the Settlement Agreement

3

prior to the Settlement Conference, nor did Mr. Howell review it with her at the Settlement

Conference before she agreed to it.  (Doc. 100) at 4, 7.  Mr. Howell alleges, and provides an

exhibit showing, that he emailed the proposed written agreement to Ms. Whitaker on July 8,

2021, one week before the conference.  (Doc. 86) at 13 and Ex. E.[3]  Ms. Whitaker concedes the

email was sent, but explains that because of automatic Gmail filtering, she did not see it.  (Doc.

100) at 2, 4–5.  Mr. Howell also attests that he reviewed the release with Ms. Whitaker

"paragraph by paragraph" in front of Judge Robbenhaar at the Settlement Conference before the

Court went on the record.  (Doc. 97) at 13, n.4.

　　　In the days following the Settlement Conference, when the written agreement was sent to

Ms. Whitaker for her signature, she demurred.  *See, e.g.*, (Doc. 76) at 1–2; (Doc. 86) at 13.  She

raised concerns with the substance of the agreement and with the process by which it was

reached.  (Doc. 76) at 2.  Eventually, she sought to terminate Mr. Howell as her attorney, and he

withdrew from the case.  (Docs. 78, 82).

　　　In the aftermath, Mr. Howell submitted his Motion to Enforce his Charging Lien and to

Intervene to protect the portion of the settlement to which he claims to be entitled.  (Doc. 86).

Ms. Whitaker continued *pro se* and submitted her Motion to Throw Out/Invalidate the Settlement

---

[3] The Court notes these communications would normally be covered by attorney-client privilege.
Ms. Whitaker, however, first broached the topic of Mr. Howell's behavior, and requested Mr.
Howell withdraw as counsel, in two Status Conferences on August 3, 2021. (Docs. 76, 77).  The
exhibits filed by Mr. Howell with (Doc. 86) are allowed, therefore, under the New Mexico Rules
of Professional Conduct covering attorney-client privilege. *See* NMRA 16-106(5) (permitting
disclosure of privileged information to "establish a claim or defense on behalf of the lawyer in a
controversy between the lawyer and the client…"). In any event, once Ms. Whitaker filed (Doc.
100) with privileged emails attached as exhibits, she waived attorney-client privilege regarding
communications about the Settlement Conference. *See Pub. Serv. Co. of New Mexico v. Lyons*,
2000-NMCA-077, ¶ 23 (requiring "offensive or direct use of privileged materials before the
party will be deemed to have waived its attorney-client privileges").

Agreement. (Doc. 91). And the Government cross-motioned to enforce the Settlement

Agreement as agreed to at the Settlement Conference. (Doc. 95).

II.     *Settlement Agreement*

Ms. Whitaker asks that the settlement agreement be declared "null and void." (Doc. 91)

at 2. The Court must determine, first, if a valid settlement agreement was formed, and second, if

that agreement is enforceable given the allegations that Ms. Whitaker lodges against it. For the

sake of transparency, this Court provides its analysis in some detail.

A.   *Valid Formation of Settlement Agreement*

Because settlement agreements are contracts, issues involving the formation and

construction of a purported settlement agreement are resolved by applying state contract law.

*Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (citing *Shoels v. Klebold*,

375 F.3d 1054, 1060 (10th Cir. 2004)). Under New Mexico law, to be legally formed, "a

contract must be factually supported by an offer, an acceptance, consideration, and mutual

assent." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 959 (10th Cir. 2021) (quoting

*Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9).

Here, the settlement agreement meets each of the elements for formation. The emails

preceding the Settlement Conference and the transcript of the Settlement Conference clearly

show that (1) there was an offer to pay a lump sum in return for settling all claims, (2) Ms.

Whitaker accepted the terms of the Settlement Agreement, (3) the agreement contains valuable

consideration from both parties—$650,000 in exchange for a release of claims—and (4) both

parties assented to the agreement on the record.

The Court concludes that a valid settlement agreement has been formed. The Court notes

that the oral agreement here creates a valid and enforceable contract. The "absence of a formal,

written agreement" is not "fatal to the existence of a contract." *Talbott v. Roswell Hosp. Corp.*, 2005-NMCA-109, ¶ 13, 138 N.M. 189. "[E]xcept for statutory enactments which require a writing as a precondition to enforceability ... there is no difference between oral and written contracts." *Id.* (quoting 1 Richard A. Lord, Williston on Contracts § 1:16, at 39 (1990)). In fact, New Mexico courts have enforced settlement agreements in scenarios like this one—where the agreement was entered into orally on the record but where a party later refused to sign and sought to repudiate it. *See, e.g.*, *Herrera v. Herrera*, 1999-NMCA-034, ¶ 16, 126 N.M. 705 (holding husband's statement at settlement conference of agreement to oral terms of separation agreement was sufficient to enforce agreement despite his refusal to sign and notarize).

    B. *Enforceability of Settlement Agreement*

    Having found that a valid settlement agreement was formed, the Court turns now to Ms. Whitaker's allegations against it and whether it is enforceable. Ms. Whitaker argues, essentially, that the settlement agreement should be void because she was pressured into agreeing, because she did not know the terms in the written agreement, and because she was unable to contribute critical terms to the final written agreement. *See generally* (Docs. 91, 100). Specifically, Ms. Whitaker asserts the following reasons for invalidating the settlement agreement:

    (1) That she was "pressured" into orally agreeing to it by Judge Robbenhaar and Mr. Howell. (Doc. 91) at 1. Ms. Whitaker alleges that before and at the Settlement Conference Mr. Howell was "belligerent" and told her that "he had had enough of this case and just wanted to get it over with." (Doc. 100) at 5. And she alleges that Judge Robbenhaar "tongue-lashed" her, telling her she was not participating in the process and threatening to end the mediation. *Id.*

(2) That the agreement is "fraudulent" because Mr. Howell withheld "vital information" from her about her physical sickness not being written into the agreement and about the tax consequences of the agreement—particularly that the money would be given with a 1099, not a W-2; that it could not be received in the form of a "structured settlement" to reduce tax liability; and that she would have tax liability for the portion of the settlement going to Mr. Howell.  (Doc. 91) at 2; (Doc. 100) at 1–2, 34–37.

(3) That Mr. Howell intentionally "misled" her and did not discuss details as a tactic to get her to agree.  (Doc. 100) at 2, 6.

(4) That Mr. Howell's counteroffer before the conference was a "deception" because it was "worthless," and that the Defendant's offer was actually a "final and fixed settlement agreement."  (Doc. 100) at 6.

(5) That Mr. Howell did not share the proposed written Settlement Agreement with her before the Settlement Conference.  (Doc. 100) at 4.

(6) That Mr. Howell never reviewed the Settlement Agreement with her at the Settlement Conference and that she never saw it until after the conference.  (Doc. 100) at 7.

(7) That she believed the agreement would only be finalized upon signature, that the oral agreement was a preliminary agreement to the monetary consideration, that she still had time to contribute terms and reconsider before signing, that Mr. Howell would continue negotiating and drafting the final agreement, and that he "intentionally mislead" her that the negotiations were still on-going.  (Doc. 100) at 3–4.

Several ways to challenge the enforceability of a contract under New Mexico law are implicated by a liberal reading of Ms. Whitaker's briefing: unconscionability, duress, and fraud.[4] *See Quintana v. Motel 6, Inc.*, 1984-NMCA-134, ¶ 4, 102 N.M. 229, 230, 693 P.2d 597, 598 ("Generally, in order to set aside or avoid a written settlement or release, there must be evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake, and such evidence must be clear and convincing"). Addressing each in turn, this Court concludes that Ms. Whitaker's allegations, considered against the record, do not merit invalidating or voiding the settlement agreement.

First, unconscionability comes in two forms: substantive and procedural. Substantive unconscionability is found where the contract terms themselves are "illegal, contrary to public policy, or grossly unfair." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 32, 329 P.3d 658. The Court concludes that the terms of the agreement are not grossly unfair. On the record at the Settlement Conference, Judge Robbenhaar stated, "I can tell you I sense that neither side is particularly happy, but unfortunately—or maybe fortunately, from my end—that's a good settlement." (Doc. 95) Ex. 1 at 4:24–5:3.

Procedural unconscionability "relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms." *Hunt v. Rio at Rust Ctr., LLC*, 2021-NMCA-043, ¶ 19 (quoting 8 Samuel Williston & Richard A. Lord, Williston on Contracts § 18:10 (4th ed. 2019)). Procedural unconscionability relates to inequality in the

---

[4] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. We believe that this rule means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority" or "his confusion of various legal theories") (internal citations omitted).

formation of the contract and may be found "only where the inequality is so gross that one party's choice is effectively non-existent." *Id.* at ¶ 20 (quoting *Guthmann v. LaVida Llena*, 1985-NMSC-106, ¶ 18, 103 N.M. 506). Whether a party has a meaningful choice is "determined by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." *Id.* (quoting *Guthmann*, 1985-NMSC-106, ¶ 16, 103 N.M. 506).

One important factor is whether an agreement is a contract of adhesion—that is, "a standardized contract offered by a transacting party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." *Id.* at ¶ 21 (quoting *Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 35, 304 P.3d 409). An adhesion contract is procedurally unconscionable and unenforceable "when the terms are patently unfair to the weaker party." *Id.* (quoting *Cordova v. World Finance Corp. of NM*, 2009-NMSC-021, ¶ 33, 146 N.M. 256).

The Court concludes that the Settlement Agreement does not suffer from procedural unconscionability. There is no large difference in bargaining power between the parties. Ms. Whitaker entered these negotiations represented by an experienced attorney and negotiated in the structured environment of a settlement conference in front of a federal judge. And Ms. Whitaker was not denied a real choice about entering the agreement—she could have rejected the offer and gone to trial. This was not the sort of lop-sided negotiation that is rife with inequality, procedural deficiencies, or a lack of choice, or which may be construed as unconscionable.

To the extent that Ms. Whitaker claims unconscionability because she did not understand what was in the agreement, this Court finds that the record supports the conclusion that Ms. Whitaker had access to the agreement before and during the Settlement Conference. New

Mexico law imposes a well-established duty upon the parties to a contract to read and familiarize themselves with its contents before they agree to it. *See, e.g., Jones v. Auge*, 2015-NMCA-016, ¶ 32, 344 P.3d 989. Furthermore, "each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." *Id.* (quoting *Ballard v. Chavez*, 1994–NMSC–007, ¶ 8, 117 N.M. 1).

Finally, while the Government's standardized release form does not allow for changing certain terms, the agreement is distinct from "patently unfair" adhesion contracts. *See, e.g., Fiser v. Dell Computer Corp.*, 2008-NMSC-046, 144 N.M. 464 (holding class action ban in personal computer purchase contract patently unfair); *Rivera v. American General Financial Services, Inc.*, 2011-NMSC-033, 150 N.M. 398 (holding arbitration requirement in car title loan contract patently unfair). In those settings, one party enjoys significant bargaining power over a weaker party who cannot avoid doing business, and the contract is offered without any opportunity for bargaining. Here, Ms. Whitaker had the opportunity to negotiate what is arguably the most critical term—the settlement amount—and could have avoided the settlement altogether by refusing it and proceeding to trial. While the procedural terms of the payment do not meet Ms. Whitaker's preference, they cannot be deemed "patently unfair." The Court concludes that neither the negotiation nor the terms of the Settlement Agreement are unconscionable.

Next, the Court addresses duress. Any contract entered into under duress is voidable and subject to rescission. *Romero v. Bank of the Southwest*, 2003-NMCA-124, 135 N.M. 1. Modern New Mexico case law generalizes duress as where "a person has been coerced into the transaction by the wrongful act of another." *Richards v. Allianz Life Ins. Co. of North America*, 2003-NMCA-001, ¶ 30, 133 N.M. 229. More specifically, duress is "intentional action by one person presenting such a serious business or financial loss or injury to the other person to the

10

contract that he or she has no reasonable choice or alternative." *Id.* at ¶ 31 (quoting UJI 13-838 NMRA 2002). One such type of "intentional action" is an "improper threat that leaves the victim no reasonable alternative." *Id.* at ¶¶ 33–34. Types of threats which are improper include threatened crimes or torts, threatened criminal prosecution or civil litigation, or a threat which is a use of power for illegitimate ends. *Id.*

The Court concludes that Ms. Whitaker's assertion of duress fails to establish that she was forced or coerced into agreeing to the settlement. First, she stated on the record that she was not forced or threatened. Second, setting aside that her allegation of duress is directed not at the opposing party but at her own representative and the neutral arbiter, neither a statement by the Judge that he was prepared to end the conference nor a statement by her attorney that he was ready to be done with the case rise to the level of improper threats.

Finally, the Court addresses fraud. Under New Mexico law, "rescission is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." *Prudential Ins. Co. of Am. v. Anaya*, 1967-NMSC-132, ¶ 8, 78 N.M. 101. "A representation or concealment of a fact is material if it operates as an inducement to the [party] to enter into the contract, where, except for such inducement, it would not have done so." *Modisette v. Found. Rsrv. Ins. Co.*, 1967-NMSC-094, ¶ 20, 77 N.M. 661. If a misrepresentation is "material," the contract may be voided, "irrespective of the good or bad faith of the party making the misrepresentation." *Robison v. Katz*, 1980-NMCA-045, ¶ 10, 94 N.M. 314. When the misrepresentation is not material, however, fraudulent intent must be shown. *See Sisneros v. Citadel Broadcasting Co.*, 2006-NMCA-102, ¶ 24.

The Court concludes that Ms. Whitaker's allegation of fraud is controverted by the record. Here, Ms. Whitaker accuses her own agent of fraudulently "withholding vital

information." (Doc. 91) at 2. She alleges specifically that Mr. Howell did not share the Settlement Agreement with her, did not explain how her "physical sickness" would affect the settlement, did not properly explain the tax consequences of being issued a form 1099 rather than a W-2, did not explain that a "structured settlement" was unavailable, intentionally misled her that the Settlement Agreement was still open to negotiation, and generally failed to prepare Ms. Whitaker for the Settlement Conference. (Doc. 100) at 2–7.

That Mr. Howell withheld the actual Settlement Agreement from Ms. Whitaker is controverted by the emails shared by both parties. *See, e.g.*, (Doc. 86) Ex. E at 1 (July 8, 2021 email from Mr. Howell to Ms. Whitaker forwarding Settlement Agreement as attachment); (Doc. 100) at 11 (July 8, 2021, email from Mr. Howell to Ms. Whitaker including original email from Defendant with proposed Settlement Agreement and discussing with Ms. Whitaker a proposed response). Additionally, to the extent Ms. Whitaker did not see the Settlement Agreement before the conference, she acknowledges it was because of Gmail filtering, not because Mr. Howell (or Defendant) failed to send it to her. (Doc. 100) at 2. And Mr. Howell alleges he reviewed the Settlement Agreement with Ms. Whitaker, paragraph by paragraph, over Zoom at the Settlement Conference. (Doc. 72) Ex. B at 8 (July 19, 2021, email from Mr. Howell to Ms. Whitaker reminding her that he reviewed "each paragraph" of the release over Zoom during the mediation); (Doc. 97) at 13, n.4 (attesting in signed brief that he read the Settlement paragraph by paragraph over zoom with Judge Robbenhaar present).

The Court is not convinced by the allegation that Mr. Howell fraudulently withheld vital information which persuaded Ms. Whitaker to agree to the agreement. First, Ms. Whitaker's assertion that Mr. Howell misled her by implying the Agreement was still open to negotiation is controverted by the record of the Settlement Conference, in which Judge Robbenhaar stated

12

"there's no editing or changing of the form permitted" before asking Ms. Whitaker if she agreed to the Settlement.  (Doc. 95) Ex. 1 at 3:3–4.

Second, the Court notes that because the settlement will come out of the United States Judgment Fund, there is limited opportunity to negotiate payment structure details in the first place, and the record indicates Ms. Whitaker did not raise her specific concerns about taxes until after the Settlement Conference.  (Doc. 100) at 34 (email from Ms. Whitaker to Mr. Howell on July 17, 2021, one day after settlement conference, requesting to "create a 401k" to "control tax payments"); (Doc. 100) at 35 (email from Mr. Howell to Ms. Whitaker on July 23, 2021, describing conversation with U.S. Attorneys and explaining settlement would be issued with 1099 and could not be issued with W-2 because Ms. Whitaker is no longer employee); (Doc. 100) at 36 (email from Ms. Whitaker to Mr. Howell on July 26, 2021, stating "I will not sign to accept a 1099 unless we can work out a structured settlement to spread out the tax liability").

Mr. Howell similarly states multiple times that he did not know about Ms. Whitaker's concerns about tax liability until after the Settlement negotiations.  (Doc. 100) at 35 (July 23, 2021, email from Mr. Howell to Ms. Whitaker); (Doc. 97) Ex. B at 2 (July 26, 2021, email from Mr. Howell to Ms. Whitaker stating she never asked for a "structured settlement" during negotiations or mediation); (Doc. 72) Ex. B at 9 (July 19, 2021, email from Mr. Howell to Ms. Whitaker stating she never asked for 401k contributions during the mediation, and that he had not and could not say exactly what her tax liability would be because  that "is not at all my practice area"); (Doc. 97) at 15, n. 5 (attesting that Ms. Whitaker "never beforehand" made requests about "tax treatment," "medical characterizations," tax forms, or "401(k) contributions").  And when those concerns were raised, Mr. Howell spoke with the Government's attorneys and promptly explained to Ms. Whitaker what was and was not possible.

(Doc. 100) at 35 (email from Mr. Howell to Ms. Whitaker on July 23, 2021, describing conversation with U.S. Attorneys and explaining settlement would be issued from the Government's "Judgment Fund," a W-2 was not an available option, 401(k) contributions were not a possible payment scheme, etc.).

Mr. Howell at multiple turns encouraged Ms. Whitaker to speak to a tax attorney about her specific tax liability and how to best meet her financial goals, but at no point communicates that alternate payment structures are a possibility. *See, e.g.*, (Doc. 72) Ex. B at 8 (July 19, 2021, email from Mr. Howell to Ms. Whitaker stating "you can of course talk to a tax advisor – as I have encouraged you to do all along, and especially before each mediation").

Finally, while Ms. Whitaker alleges that she was not prepared for the Settlement Conference by her attorney, Mr. Howell points out that her own exhibits indicate she was in regular contact with him.

> From July 8-15, 2021, her own telephone logs show 10 calls, totaling 2 hours and 37 minutes talk, with Howell's telephone number, (505) 919-9158. *See Reply* [Doc. 100] at 22-23 (documenting the following calls: (1) July 8, 2:21 p.m., for 3 minutes; (2) July 8, 2:30 p.m., for 2 minutes; (3) July 8, 4:05 p.m., for 30 minutes; (4) July 8, 6:46 p.m., for 7 minutes; (5) July 8, 7:31 p.m., for 3 minutes; (6) July 8, 7:38 p.m., for 4 minutes; (7) July 12, 11:39 a.m., for 42 minutes; (8) July 12, 5:44 p.m., for 2 minutes; (9) July 12, 6:19 p.m., for 11 minutes; and (10) July 14, 9:34 a.m., for 53 minutes). Likewise, her own e-mail inbox shows at least nine e-mails from Howell from July 8th through July 15th. *See Reply* [Doc. 100] at 23-31 (documenting five emails on July 8th, one on July 9th, two on July 13th, and one on July 15th). Finally, while Whitaker's logs also show more calls and e-mails on July 16, 2021, it is more important to note that on that day, Howell, Whitaker, HHS, and Judge Robbenhaar were continuously connected via Zoom for over seven hours, conducting the settlement conference. *See Clerk's Minutes* [Doc. 72].

(Doc. 101) at 2, n.1.

The Court is not convinced that Mr. Howell acted with fraudulent intent. While it may be possible that there were omissions or misunderstandings in the communication between Mr. Howell and his then-client, the Court finds that Ms. Whitaker failed to carry

her burden of showing that critical terms of the agreement were withheld from her, that she was only persuaded to agree by hiding the tax liability she would carry, or that Mr. Howell intentionally withheld information that she felt was critical.  In conclusion, Ms. Whitaker does not persuade the Court to invalidate the settlement agreement for fraud.

A trial court "has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993); *see also Gonzales v. Atnip*, 1984-NMCA-128, 102 N.M. 194.  "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, however, the parties must be allowed an evidentiary hearing." *Hardage*, 982 F.2d at 1496.  This Court finds the material facts here are not in dispute and no evidentiary hearing is required.  In *Hardage*, the Tenth Circuit remanded the case for an evidentiary hearing where the two opposing parties disagreed over whether the offer had been revoked before acceptance—a core question of formation, and thus a material fact dispute.  *Id.* at 1497.  Here, the transcript of the Settlement Conference established valid formation.

New Mexico policy is "to favor the settlement of disputed claims," *Herrera v. Herrera*, 1999-NMCA-034, ¶ 17, 126 N.M. 705, and to discourage allowing parties to repudiate valid contracts unless they "clearly contravene some law or rule of public morals," *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶ 20, 134 N.M. 341.  No such contravention exists here. For this and the forgoing reasons, this Court denies Ms. Whitaker's Motion to Invalidate the agreement and grants Defendant Becerra's Motion to Enforce it.

III.   *Intervention and Attorney's Charging Lien*

   A.   *Intervention*

     Mr. Howell seeks to intervene as a matter of right.  His Motion to Intervene was unopposed by either named party.  *See* (Doc. 88).  Rule 24(a) governs intervention as of right and provides that courts must permit anyone to intervene who claims an interest in the property or transaction that is not adequately represented by the existing parties.  Fed. R. Civ. P. 24(a)(1)-(2).  So, Mr. Howell may intervene as of right under Rule 24(a)(2) if: "(1) the application is timely; (2) the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) the applicant's interest may as a practical matter be impaired or impeded; and (4) the applicant's interest is not adequately represented by existing parties."  *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001) (internal citations omitted).  The Court notes that the Tenth Circuit "follows a somewhat liberal line in allowing intervention."  *WildEarth Guardians v. United States Forest Service*, 573 F.3d 992, 995 (10th Cir. 2009).

     The Court determines Mr. Howell may intervene as a matter of right for the following reasons: First, his Motion to Intervene is timely because it was unopposed and was first made only six days after his withdrawal from the case.  (Docs. 82, 85); *see Utah Ass'n of Counties*, 255 F.3d at 1250 (stating that court assesses timeliness of motion to intervene "in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances" (citation omitted)).  Second, the Court finds Mr. Howell has an interest in the settlement agreement that is the subject of the underlying action and his interest will be impaired without the ability to enforce a charging lien.  Finally, Mr. Howell's interest is not represented

by either the Government, which is neutral on the issue, or Ms. Whitaker, whose interest

conflicts with Mr. Howell's on the issue.

   *B.  Charging Lien*

   Mr. Howell provided notice on July 31, 2021, to all parties and the Court of his charging

lien in this case, to which he asserts his written agreement with Ms. Whitaker entitles him.  (Doc.

73).  He now asks the Court to enforce that lien, and the Court does.

   The Court notes supplemental jurisdiction over the issue.  *See Jenkins v. Weinshienk*, 670

F.2d 915, 918 (10th Cir.1982) (holding a court has proper supplemental jurisdiction over

disputes between an attorney and his or her client when the dispute involves fees "with respect to

the work done in the suit being litigated"); see *also Garrick v. Weaver*, 888 F.2d 687, 690 (10th

Cir. 1989) (holding a court has proper supplemental jurisdiction over disputes between a client

and her former attorney).

   The Court concludes Mr. Howell is entitled to an interest in the funds he obtained for his

client both under his contract with his client and under New Mexico law.  Under the terms of

their Engagement Letter, Ms. Whitaker agreed to pay Mr. Howell a contingency fee in the form

of a percentage of any recovery obtained.  *See* (Doc. 86), Ex. A at ¶ 2 (Engagement Letter).  The

Engagement Letter also entitles Mr. Howell to a retaining or charging lien against any proceeds

for unreimbursed interest owed under the agreement.  *See id.* at ¶ 12.

   An attorney's charging lien originates in New Mexico common law.  *See Albuquerque*

*Tech. Vocational Inst. v. Gen. Meters Corp.*, 17 Fed. Appx. 870, 874 (10th Cir. 2001).  The

attorney's lien protects the attorney's right "to recover his fees and money expended on behalf of

his client from a fund recovered by his efforts, and also the right to have the court interfere to

prevent payment by the judgment debtor to the creditor in fraud of his right to the same."

*Albuquerque Tech. Vocational Inst.*, 17 Fed. Appx. at 874 (quoting *Prichard v. Fulmer*, 1916-NMSC-046, 22 N.M. 134).  The lien is subject to the court's equitable discretion for its enforcement, and it is left to the court to "determine whether and to what extent to enforce it.  *In the Matter of Est. of Antonio Roybal*, 2008-NMCA-110, ¶ 14, 144 N.M. 679.  There are four requirements for recovery under the lien: (1) a valid contract between the attorney and client; (2) there must be a fund recovered by the attorney; (3) there must be clear and unequivocal notice of the intent to assert a lien; and (4) timely assertion of the lien.  *See Sowder v. Sowder*, 1999-NMCA-058, ¶¶ 10–14, 127 N.M. 114.

The Court finds all four requirements are met.  Mr. Howell and Ms. Whitaker entered a valid contractual relationship with the Engagement Letter, Mr. Howell obtained a valid Settlement Agreement with considerable funds, and he clearly and timely noticed the Court and parties of his intent to assert the lien.

After reviewing the material submitted by Mr. Howell, the Court finds that the contingency assessed is reasonable.  Thirty percent is within or below the normal range for an attorney of like experience handling a case of this type.  *See* (Doc. 86) Ex. H, ¶ 13 (Decl. of Phil B. Davis) (attesting that in a complex employment case, the normal contingency range of plaintiff's attorneys in New Mexico is 33% to 40%).  The Court notes that the original percentage from the Engagement Letter was 35% but that Mr. Howell voluntarily decreased his percentage to 30% to accommodate the settlement and allow Ms. Whitaker a larger net recovery.

For those reasons, the Court will enforce Mr. Howell's Attorney Charging Lien.

IT IS THEREFORE ORDERED that:

1. Ms. Whitaker's Motion to Throw Out/Invalidate the Verbal Acceptance of Settlement
   Agreement (Doc. 91) is denied;

2. Defendant Xavier Becerra's Cross Motion to Enforce Settlement Agreement (Doc. 95) is granted;

3. Mr. Howell's Motion to Intervene to Enforce Charging Lien (Doc. 86) is granted;

4. Mr. Howell's Motion to File Surreply (Doc. 103) is denied as moot, as is Ms. Whitaker's response to his Motion (Doc. 104);

5. the July 16, 2021, Settlement Agreement is valid and enforceable, and the parties are bound by it in its entirety;

6. Trent A. Howell is permitted to intervene in this lawsuit;

7. Trent A. Howell has an enforceable Attorney's Charging Lien in the settlement fund in the amount of $195,876.22.

IT IS FURTHER ORDERED THAT:

8. Defendant will pay $195,876.22 to Intervenor Howell within the timeframe specified in the Settlement Agreement.  To the extent he has not already done so, Intervenor Howell will provide a W-9 and any additional information necessary for payment to Defendant within seven (7) days of entry of this Order;

9. Plaintiff Whitaker will provide Defendant with any information necessary to complete payment within seven (7) days of entry of this Order;

10. Defendant will pay $454,123.78 to Plaintiff Dorothy Whitaker within the timeframe specified in the Settlement Agreement; and

11. Defendant will notify the Court when all payments have been made so that the case may be dismissed with prejudice.

IT IS SO ORDERED

UNITED STATES DISTRICT JUDGE